for the Appellant, Mr. Gregory, and for the Appellant, Mr. Lynch. You may proceed, Mr. Gregory. Your Honors, my name is William Gregory. I'm here on behalf of the Defendant and Appellant to Central Freight Lines. As you know, this is a case involving a commercial lease in which my client leased some premises from the plaintiff, basically a location to Central Freight Lines.  A place to store and to park trucks and trailers and that type of thing. Your Honors have some photos of the area that was leased, which show that this was essentially a metal building with a roof, no sides, no doors, and a small office space. My client leased that property beginning in 2002, and the lease was set to expire on October 31, 2009. However, as my client testified, they vacated the property in March of 2008. Did they terminate their agreement? Specifically in writing, they did not. They did notify the plaintiff, though, that they had vacated the premises. But there was a lease agreement and they still had to pay rent, even though they vacated? They still had to pay rent, which they did. And all the duties under the lease they had to take care of until the end of the lease term, is that right? I would disagree with that, depending on how you mean that. Obviously there are duties that remain in that, but obviously part of our argument is mitigation of damages and the fact that they vacated the premises and gave up the possession of the property at that point. And I believe that the evidence would indicate that. Wasn't there a forcible entry and detainer that had to take place in order for the property to be recovered? I'm sorry, I didn't mean to cut you off. There was a forcible entry and detainer action that was filed. There was a default order that was entered on that, and that has been resolved. However, it's the plaintiff's position that that was filed for the purpose of getting paid the rent that was not being paid, plus the utilities. And part of the point is that the plaintiff in that case only asked for utilities up through the date that the plaintiff testified that they vacated the premises. So they stopped asking for utilities from the point in which plaintiff testified that they vacated the premises. And then at that point forward, they just specifically asked for rent. They didn't ask for any utilities, which it's our position that that would show that they knew of that. The other issue is that Mr. Richards... So you're saying that means they knew, but you're not saying that they no longer had those obligations under the contract. I believe that under the contract they had... possession, that that also put an obligation on the plaintiff to mitigate any damages that would result from the property not being there. And in regards to that, I believe that the evidence shows that the plaintiff did in fact have possession and knew that the defendants had vacated that property. There are letters from Mark Sherman, who is the Director of Properties, in April of 2008 to the defendant indicating that someone had went out to the property, had inspected the property, and that they were requesting specific things be done to correct some issues on the property, mainly cleanup type of issues. Oil, garbage, things like that, there was an issue addressed in regards to a dock scale. So clearly the plaintiff went out to the property the following month, inspected it, took some pictures, sent it to the defendant and said, these are the issues that we need you to resolve. And so then actually the plaintiff resolved those, sent pictures back along with an email back saying, hey, we've resolved these. And as far as the plaintiff was concerned, they had given up the possession. Yes, they were still owing rent for that time period because they had signed a contract stating that they were paying, that they were obligated to pay that rent. Obviously if the plaintiff had released that premises at that point, it would be our position that that would even be a factor that would reduce the damages they could have claimed, but that's a separate case. But the other issue that I find is, and actually as I was going through this, is that as Mr. Lynch indicates, he states in his brief, on page 5 of his brief, he states that he's talking about the forcible entry and container case, and he states that the trial court in this case awarded past due rent and internal damages to the premises. See Plaintiff's Group Exhibit 6 showing the date of the order of possession, entitling the owner to take possession on September 9th of 2009. There is no evidence in the record that the plaintiff had a right to peaceably take the premises before entering that order of possession. Now, based on what he's describing to you, that order was entered on September 9th of 2009. Now, we have the inspection that occurred in April of 2008, which Mr. Richards had indicated would not have been able to have happened unless the plaintiff had keys to the property, had access to the property, and the defendant had relinquished that. In addition, if you look on page 72 of Mr. Richards' deposition, he confirmed that the inspection that he performed was performed in August of 2009, which also was before the date of the order of possession. And Mr. Richards confirmed that they had vacated the premises, that the defendant was no longer using the premises in August of 2009, and he clearly had access to the property, did a full inspection according to his testimony, took a few pictures, and submitted those. So if, in fact, the plaintiff filed this in order to get possession, then how is it that Mr. Richards is on the property a month beforehand inspecting it, taking pictures? How is it that Mr. Sherman had somebody in April of 2008 without the possession? If I rent an apartment and the apartment owner comes and says, I'm just looking around to check and see if everything's in good shape, does that somehow impinge on my possessory interest? I don't think so. No, but there's no indication that that's what happened here. But aren't you taking a leap in assuming that because this inspection occurred, somehow the property had been turned back over to the plaintiff? Well, that was Mr. Richards' testimony. He had testified that they would not have had access to do that type of inspection unless they had been given the keys and the property had been returned to them. So it's not an assumption, it's what he testified to. That was his explanation of it, was in March of 2008, we vacated the property, we gave it back to them. And there's no evidence that's been presented by the plaintiff that would contradict that. And so, I mean, basically the evidence is, I mean, there's evidence as to what the condition of the property was when the defendant vacated the premises. And then obviously you've got a year and a half later, you've got Mr. Richards going and inspecting the property again and finding a bunch of additional issues with the property that, or what he alleges to be the issues with the property. And they never notified the defendant that these issues existed. There were several communications letters sent from the plaintiff to the defendant stating, hey, you know, you haven't paid your rent. You know, we're still waiting on your rent. When are you going to pay your rent? Never did they mention at any point, hey, you know, also you've got all these other issues ongoing. I mean, they clearly had access to the property to be able to do that and they don't mention that. And so that's one of the other issues that we have in regards to that is, I mean, obviously they vacated it. They notified the plaintiff. The plaintiff said, please clean it up. They cleaned it up. They notified the plaintiff that they cleaned it up. A year and a half later, you know, they're getting sued for rent and that's it. And it was a default order. But I just, I don't believe that that has any bearing on the actual damages in this case. I mean, they sued for that rent. They got the rent. But I don't believe that that's proof that they didn't have possession, especially because they were able to get into the property twice in order to be able to inspect the property twice between those time periods. In regards to their claim for damages, Mr. Richards put together his list of those damages. And we basically, we objected to those damages on a few different reasons. The first reason was based off of the language of the lease itself. Number 19 on their list is a request for $25,200 in damage to the structure and the roof. Paragraph 10 of the lease specifically states that my client had no obligations or responsibilities in regards to the roof and the structural integrity of this terminal. And then paragraph 11 specifically excludes the roof and structural integrity of the premises as well as far as plaintiff's obligation. And so it's our position that based off of the lease, the agreement between the parties was that the defendant was not responsible for repairs or maintenance to the roof and the structure. But that's exactly what they're asking to repay. The repair of damage is done by the tenant during the time of tenancy. Well, I would say, first of all, that that is excluded though. They have to take into account that that's part of it. When they made this lease, the lease was, hey, you're going to lease this property, you're not responsible for any repairs or maintenance to the structure of the roof, period. That's what it says. So, I mean, regardless of the cause, they were not responsible under the specific terms of the lease. The other thing is that there's no actual specific evidence as to how the damage to the structure and the roof occurred. Mr. Richards speculated that this was due to what he personally witnessed, a single tipping trailer, and he further testified that there could have been other causes, other things that could have caused the damage that he observed to the roof and the structure. Finally, he had no information as to what the premises, what the condition of the premises was when the defendant's lease started. He had never been on the property prior to the defendant taking possession. He had never inspected the property prior to that. He had no ability to say, these holes in the roof weren't there when they took them over. He couldn't say that because he'd never been there. He only inspected it afterwards. I mean, his testimony was, I was there in August of 2009. I was there a few days before my deposition. That's it. That's the only time I've ever even been to the property. He had no idea. And the lease clearly says that they shall surrender the premises and at least as good a condition as received. We have no idea what the condition was when it was received. Did your client testify that when he received the property that damage was already there? I don't believe they testified that damage was already there, but I don't recall her knowing one way or the other as to whether the damage was there. And it's plaintiff's case. It's plaintiff's burden. They're the ones that have the burden of showing whether or not this damage was not, whether or not this property was returned to them in the same condition as it was received. And so if my client is like, I'm really not sure. My client is somebody who's in Arizona. She's an office person. She didn't come out and personally inspect the property either prior to them taking this lease under. So as far as specific, but what they're saying is your burden is to return it to us in the same condition it was received and there's no testimony as to what that condition was, then how do we know that this is not the same condition as it was received? We don't. But that's the plaintiff's obligation. That's not the defendant's obligation. The plaintiff needs to show that, hey, you know what, you didn't give this back to us in the same condition that it was received. Mr. Richards has no knowledge. He testified as to speculation. He testified as to different things. But he didn't have any specific knowledge of that. He specifically stated that. And there are several things in here as well. The lease also excludes normal wear and tear, damage from the elements, acts of God. For the most part, this is an open facility. There are claims in here in regards to cleaning for cleaning pigeon droppings. I would say that's normal wear and tear or an act of God. That's not something that the defendant did. There are things in here, they requested $800 to replace light bulbs. This is seven years after this lease started. I would assume light bulbs probably, after seven years, there's a very good chance it's just normal wear and tear. There's painting of the office, but we don't know what the office looked like beforehand. There's several things. He testified in regards to janitorial duties. He said it's just typical janitorial duties. What are they? Is this something that would be normal wear and tear? I don't know, because there was no specifics in regards to that. In regards to the ceiling tile, he believed that it may have been to a roof leak or an HVAC leak. Again, no knowledge of what it looked like before, but there's no specifics in regards to all of these claims for damage. In regards to the HVAC, they asked for $4,250 in cleaning and repairs. Mr. Richards specifically testifies that the maintenance was replacing filters. He didn't know how often the filters even needed to be replaced. But this again was seven years later, seven years after the lease. I would think, just logically speaking, that a filter would need to be replaced probably more than every seven years. So even if the defendant replaced that halfway through, there's no evidence that this wasn't just due to normal wear and tear. In regards to the dock plates, he says they're outside and they're exposed to elements. They seize up after time. They weren't actually broken. They just needed some preventative maintenance. Well, I mean, if it's outside and it's normal wear and tear, that's an act of God. I mean, that's normal wear and tear. These plates were exposed to the elements. Well, that's not something that the defendant is responsible to replace. It's not even broken. They asked for money to recalibrate a scale that had to be recalibrated every six months after seven years of a lease. This is something that had to have been done anyway. This is just normal wear and tear on this scale. As far as their claims for damages, we would object in regards to, obviously, as far as the evidence was presented, one of our main arguments is that the evidence submitted was not sufficient to justify these damages, especially based off of the terms of these leases. If you're talking about a lease where they don't have to pay for normal hail or weather storms come and cause damage, I don't know. And Mr. Richard said the damages in the roof could have been caused from other causes other than the tip trailers on page 313 of the record. Specifically, to hold the plaintiff responsible for $25,000 in damages to something excluded in their lease as their responsibility is something that we received, we don't even know what caused it. He didn't know. He said, I think it's probably the tip trailers. But I don't know. It could have been other things. They've had the premises for seven years. I never saw it before. How would I know whether or not this is from wear and tear, an act of God, or if it was just the condition that the defendant received it in? I can go through all the different claims for that. He never contacted any local contractors to find out what this work would cost. He doesn't have any receipts. He doesn't have any evidence other than his own opinions in regards to what the actual value is as far as how much they're asking for the defendant to pay. In that regard, he testified that he'd been working in this area for seven years, but in that seven-year period, this was only his second case in Central Illinois that he'd ever done. We don't know when the first one was. We don't know what it involved. We have no information as to what he did in that case. So we just have him being somebody who's done this for seven years for this company, going around and looking at properties and saying, oh, I think I want $4,000 for that, and I think I want $4,500 for that, and I think I need $800 for this. Well, if the court found he had sufficient expertise and you put on no countervailing evidence, found him credible, found he had the expertise, and accepted his testimony, and there's nothing else for the court to look at, what's the court supposed to do? I guess I would say that I would just disagree. I think the manifest way of the evidence is that the court gave this guy the benefit of the doubt, but the evidence doesn't support that. There's no train here. There's no education. I have a degree. I have this. I have that. I worked in this area for 50 years, and this is what I do type of thing. I've been to Central Illinois once before, and so I just know what things cost here. It's the plaintiff's position that that's not sufficient, and that the court's ruling that that was sufficient is against the manifest way of the evidence. It's also our position that the court's finding that they've proved these damages with any type of sufficiency is against the manifest way of the evidence, and it's also most of it is excluded by the terms of the lease itself. The lease itself excludes repairs and maintenance to the structure and the roof. Regardless of how you try to explain what those damages were, Mr. Richards clearly said they were damages to the structure and the roof, so those are not counted. The acts of God, wear and tear, exposure to the elements, the defendant's not responsible for those according to the terms of the lease, and that's what this is. This is a suit to recover damages under the terms of the lease, and if the lease says the defendant's not responsible for those, then the defendant should not be responsible for those, and so therefore we're asking you to reverse the trial court's decision. Thank you. Thank you. I'll have additional time on rebuttal, Mr. Lynch. I think the analogy, a perfect analogy was presented in one of the questions that was asked from the bench. Mr. Justice Appleton said, you know, what if I had an apartment? What if this is an apartment house, and I was the apartment owner, and I came on to take pictures of the hallway and the doorway and to see if your plumbing was working? What if I came in to see if the carpet was okay, or if your ceiling fans were working? Does that mean that because I'm present on the premises, you've tendered it to me, the property owner? That analogy is perfect, and it can be extended to the whole case. Here's how. Think of this. Let's say you have an apartment complex, and you're the apartment manager, and you're the apartment owner, and the apartment owner agrees, we're going to maintain the lawn, and we're going to keep the bushes trimmed, and we're going to put some flowers in the front lawn, and we're going to cut the grass, and we're going to sweep up the driveway. I think that if you were a tenant, and the grass was long and the bushes weren't trimmed, you would have something to say. At trial, you should offer some evidence, but you'd have something to say if that wasn't performed. If, however, the tenant takes his four-wheeler and runs through the grass, makes a bunch of divots and ruts, and runs over a bush, surely at trial, the tenant could not be heard to say, you said you were going to maintain the grass, and so if I run my trailer, my I run over a bush, that's excluded from the lease. Here's a problem that we have with defendant's argument in this case, is I think it ignores the standard review applicable to each and every argument they've made. If I can, this was a bench trial. The judge made specific findings about the credibility of witnesses that appeared before the court, right? In fact, as Madam Justice Polk noted, he even put that in his order. His final order says, you know, I find that this guy was credible and helpful. At a bench trial, the issue is whether or not the judge's decision is against the manifest weight of the evidence. It's not de novo, as appellant's brief suggests, but the results of a bench trial are the manifest weight of the evidence. But there are two more standards of review that we have to look at here, and the other is the trial court's decision with respect to the reliability, credibility, and veracity of the witnesses, particularly an expert that appears in front of them. You know, in the situation where there's an apartment complex, it becomes that trial court. It becomes that bench trial, whereas our friend Judge Mills would say the rubber meets the road. That's where business relationships and obligations get sorted out. And that's where the parties bears a burden of proof. But that burden is not such that it's incessantly unmeetable, so that you can stand moot in front of the court and offer no evidence to the court and continuously complain, you didn't offer enough evidence, you didn't offer enough evidence, you didn't offer enough evidence. Trials in cases like this are functional ways that business relationships get sorted out. And there's a practical legal application that we apply to it. We take a practical view of them. And so the appellate court develops a view that if the trial court is relying on expert witnesses, you've always deferred to them. There are cases that I've cited in my brief, but the determination of whether an expert is reliable is based on an abusive discretion standard. And so if the trial court says, look, I found this witness to be reliable when I'm trying to sort out these business arrangements, the appellate court has consistently said, we're going to defer, we're going to take a deferential view of the trial court's view of those witnesses. And we will not substitute our judgment for his. Sitting here in the appellate court instead of over across the street, there's an abuse of discretion. And so that's why the practical nature of a contract action or a property damage action really relies on the standard of review that the appellate court employs. Because it gives the authority to the trial court to make these fundamental decisions. And that fundamental decision in this case was, I heard an expert, that person appeared impressive to me and seemed to know what he was talking about. I decided to find him credible. And bear in mind, there was no other testimony offered. There's no testimony that bird droppings is a natural, God-given occurrence. Or there's no testimony offered, for example, about the scale. Gee, this really wasn't damage. We contradict the plaintiff's evidence. This was something else. They stood moot. The third standard review that I think we need to keep in mind here is that the burden of proof for a plaintiff in this kind of business relationship is not to prove exactly what the model make and year of the four-wheel drive you ran over the grass was. The burden of proof is not infinite and continuous and ever unreachable. And that's kind of what the argument sounds like. They didn't offer this proof. They didn't offer this proof. They didn't offer this proof. The burden of proof is that we offer sufficient evidence to the trier of fact so that they can make a determination about what's more probably true than not. In this case, the testimony of our witness, the only damage witness, and even the respondent's witness who said, you know, I was a property manager and we stopped. The purpose of that witness was to say we stopped working there in March of 2008. Both of those people said yes, this is exactly the kind of damage that happens when you don't properly brace your semi-trailer and the thing pops up and hits the roof. I'm going to tie this back to the burden of proof I was making and here it is. The burden of proof is to present evidence to the trial court of what's more probably true than not. And if you have two witnesses that are saying, this is how this exact kind of damage happens. It looks like a duck. It smells like a duck. It walks like a duck. Here's evidence of how that happens and that probably happened. You know, the burden of proof is not we establish things with great certainty. It's more probably true than not. Given that burden of proof, given that the manifest weight of evidence in this case, in fact, all and only evidence in this case favored the plaintiff's decisions, the decision in favor of the plaintiff and the trial court's determinations, and given the fact that the standard of review when the trial court picks expert testimony is a deferential one, clearly each of the three arguments made by the defendant have to fail. Here are their three arguments in a nutshell. The first one is, you agreed to mow the grass so I can drive my four-wheel over it and not pay for it. That first argument is, maintenance equals damage. And I'm glad, the court I think appreciated that because that was one of the first questions that came up. If you had those questions for me, I would appreciate them too, but I think that you're asking and the question shows your understanding of the issue. That is bad law and bad policy. To say that if an apartment owner agrees to maintain the grass, with impunity you can cause damage by your own conduct and behavior. To say that if you rent commercial premises and the premises lessor agrees to give you a nice place to work and live, you can mess that up with impunity. That's bad law and policy. We're in an age now where we think a lot about justice and we balance those things against other concerns, public policy. The law is on our side in this favor and so is a reasonable expected relationships between individuals that are in a lease agreement. And that's just a really important part of this kind of decision. I mean, they don't pay rent. They go on and on for months and months. They don't pay rent. They don't. There's no evidence they gave us the premises. We had to give a forcible entry and detainer action. They stand moot. We get the rent. They stand moot. We have to fix the damages. And now when we've proven the here is you're actually arranging expectations between a property owner and a property user in that kind of business relationship. It gets directly back to the point I was making that the best decision for the law and for policy going forward is not to determine. That maintenance and damage are the same thing and that one forgives the other. That was their first argument. The second argument was that Mr. Richards' foundational evidence, that the damage evidence was without foundation. That the testimony we gave about the nature of damages was insufficient. That's another example of how you can offer no evidence and make none of these arguments to the trial court but always say it wasn't good enough. We don't have to give you your right to get a default against us. We don't have to give you your right to get a forcible entry order against us. We don't have to clean the premises, do something. We don't have to answer. We can just stand moot and ultimately three years later go in front of the appellate court and say see they didn't prove everything. This has got to be a reasonable business standard I think. One of the points that I think comes up about the foundational aspect of Mr. Richards' testimony and how really what you can do is you can give practical effect to the quick, easy and just resolution of business disputes by giving that kind of deference to the trial court comes in my rebuttal to the suggestion that there's no evidence that we don't know what the condition of the premises was when they took over. If you look at the testimony of Mr. Richards at page 99 starting on line 7 for the next couple of pages, we said when he was giving his testimony, what was the condition of the premises? Was it like this at the start? We don't turn our buildings over like this. Does your scale work at the start? The scale worked at the start. Did your AC work at the start? Yes. Were the purlins damaged at the start of the lease? Was there bird stuff on the floor at the start of the lease? In fact, he did testify that at the start of this lease two businesses agreed on terms and one of them tendered property in good condition to the other and the other walked away and now challenges the decision of the trial court in saying you can't just walk away. Final point I want to make. Another quote you might have observation was made when the question was raised, hey, didn't you still have to pay him rent? The idea that you acknowledge that you had to pay rent, you didn't, but you acknowledged that you had to, is essential. Because if their obligation to pay rent continues, then that business relationship in its entirety continues. And if in fact we took the premises back, the answer to that question from the respondent, from the defendant, would have been well, no. We didn't have to pay him rent because they took the premises back. That brings us to the third argument that we've made. We talked about the roof not being maintenance but being damaged. We talked about Stan Richards and the court's determination that he was a reliable witness and that his testimony was supported by foundation. And I gave you some examples of how the assertion that it wasn't were inaccurate. If you read the record, you'll see that it was supported by foundation. The third point is this issue that we sort of talked our way around into and that is the mitigation of damage issue. You know, this is damage. It's not rent. They conceded they owed us rent. And we got an order making them pay for it and we got a forcible entry order so that we could get on the premises and then rent it to someone else, right? The mitigation of damage statute has been held, as I noted in my brief, to apply to the issue of accruing damages so that if rent were accruing, that statute would say, wait a minute, Lynch, you and your client can't just sit there and do nothing and let the damages accrue. That doesn't apply to when, as defendant's witness and my witness both described, you tip the trailers up and they bang the underpinning on the roof causing $25,000 of structural steel damage. One of those things can be mitigated because you can rent to another leaser, lesser, right? The other one, when the damage is done, it's got to be fixed. The way you mitigate it is to fix it. And of course, that's why we're here. These are not the kind of damages that are subject to mitigation as described in the statute. That statute applies to rent. And so I'll summarize my response this way. Maintenance. Don't confuse maintenance with damage. And by the way, we were supposed to maintain the roof. Purlins are the... These are photographs. Purlins are those beams that are underneath the roof. So you'd have to take a leap to accept the argument that by damaging the understructure, you're damaging what was covered by Section 11 of the lease. But I would ask that the court not confuse maintenance with damage. Number two, I think Judge Bell's is entitled to some deference. And I think if you read the record, you'll see that he exercised his judgment well. He didn't abuse his discretion, which is the real standard, but rather he did a really good and efficient job. And number three, once it's damaged, mitigation is irrelevant. So those are the three arguments that were made. I don't think that any of them call on this court to reverse the trial judge who in these kind of business relationships is really the front line for all of us. Thank you. In regards to the analogy that the plaintiff gave in regards to an apartment, I guess I would just like to clarify as I'm thinking about this. I mean, in reality, what happened here is more of a situation of... This is not a situation of a landlord going into an apartment and saying, hey, I'd like to look around and just check and make sure everything is okay. And then sending a letter and saying, hey, the place is a mess. Please clean it up. I mean, this would be like a landlord going into an apartment and finding that the apartment is empty and that the person has moved out. And the person actually had already told them that they moved out. And then they walk in, they examine it, they look around, and then they say, okay, well, the apartment is a mess. I want you to clean it up. Go ahead. And then they walk out knowing that the apartment is completely vacant and completely open and leaving the heat off all winter so that the pipes freeze. And then coming back and saying, oh, by the way, the pipes froze because you didn't come back and turn the heat on over the winter. So I want you to pay for that. So in this case, the pads froze because of the winter. I want you to go back and pay for that. Yes, that landlord, if he does not find another renter until the term of that lease is done, he can go back and he can get that renter to pay him for that rent, which they did. But to say that he can go back and say, well, you didn't come back over the winter nine months after you moved out and turned the heat on when I had the keys, I don't see that. The evidence is that they left in March of 2008 and that the plaintiff went in and inspected the property in April of 2008, a month later. They would have known they were gone. They would have known that there's nothing there. There's no trucks there. There's no trailers there. There's nothing there. In fact, they took pictures. And the pictures showed that there's nothing there. And they sent those to the plaintiff. So I don't believe that that analogy is similar to what we're talking about here. In regards to his statements, in regards to the fact that what the defendant is trying to do is say, well, the plaintiff presented this evidence, and we didn't present anything, but yet it's not sufficient. And the example he gave was the scale and said, well, all in all, we don't have sufficient proof that the scale wasn't broken. Well, on page 59 of Mr. Richard's deposition, he admitted that the scale wasn't broken. I mean, he stated that it just needed to be recalibrated. He stated that it needs to be recalibrated every six months. So it's not that the defendant didn't come in with enough evidence to refute it. It's the plaintiff's own evidence. It's the plaintiff's own evidence not proving the damages that they claimed and stating that these things weren't even damaged, some of them. So it's not an issue of the defendant not presenting enough evidence to rebut this. It's the fact that the evidence wasn't there in the first place. And in regards to the reference to the purlins not being the roof, well, sections 10 and 11 say the roof and the structural integrity of the terminal. It's not just the roof. It's the roof and the structure. So it doesn't say just the roof. It says the roof and the structural integrity. The other thing, I guess, is just in regards to the deference with Judge Belz. I mean, to the extent that it makes a difference, this was presented to Judge Belz. He didn't hear any live testimony in this case. This was all evidence depositions and briefs submitted to him in which he made that. So as far as his handling of this and handling of the witnesses, there was no live testimony in front of him. So he's reading exactly what you're reading. I mean, that's it. So there's no additional information there or being able to observe the manner and the character of the witnesses in this case. And then the other thing is, you know, Mark Sherman was the one that wrote these letters and he didn't testify. The plaintiff could have easily had him as their director show up and testify on their behalf in regards to the condition of the premises at the time and the different communications and the first inspection in April of 2008 and the different things that happened, and he's not there. You know, the only person that testifies is Mr. Richards, who'd never been on the property. So therefore, we again would just ask that the court consider this and reverse the trial court. Thank you. Thank you. I take this matter under advisement and stand in recess until the readiness of the next case.